UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------
                                                :
ELEANOR TEDONE,                                 :
                                                :    CASE NO. 7:07-cv-4111
                      Plaintiff,                :
                                                :
vs.                                             :    OPINION & ORDER
                                                :    [Resolving Docs. No. 25, 28, 34 & 35][1/]
H.J. HEINZ COMPANY,                             :
OWENS-ILLINOIS, INC. d/b/a                      :
OWENS-BROCKWAY GLASS                            :
CONTAINERS, MGM MIRAGE, INC.                    :
d/b/a BORGATA HOTEL CASINO SPA,                 :
                                                :
                      Defendants.               :
                                                :
------------------------------------------------------

JAMES S. GWIN,[2/] UNITED STATES DISTRICT JUDGE:

        In this personal injury case, Defendants H.J. Heinz Co. ("Heinz"), Owens-Brockway.

("Owens"), and Borgata Hotel Casino Spa ("Borgata") each move this Court for summary judgment.

[Doc. 25, 28, 35.] In addition, Defendant Owens moves this Court to exclude Plaintiff Eleanor

Tedone's expert witness Steven Lerman.  [Doc. 25.]

        Plaintiff Tedone opposes these motions and also moves this Court for summary judgment.

[Doc. 34.] Moreover, Plaintiff Tedone asks this Court to exclude Defendant Owens's expert witness

William Kilpatrick.  [Doc. 34.] Finally, Plaintiff Tedone seeks a remedy for the Defendants' alleged

spoliation of evidence.  [Doc. 34.]

---

        [1/]Pursuant to this Court's order that the parties refile all documents in text-searchable format, Borgata's motion
also appears as Doc. 65, the Plaintiff's motion as Doc. 52, and Heinz's motion as Doc. 59 & 61.

        [2/]The Honorable James S. Gwin of the United States District Court for the Northern District of Ohio, sitting
by designation.

Case No. 07-cv-4111
Gwin, J.

For the following reasons, the Court: **DENIES** the Defendant's motion to exclude the Plaintiff's expert Lerman and **DENIES** the Plaintiff's motion to exclude the Defendant's expert Kilpatrick; **DEFERS** consideration of the issue of spoliation until trial; **DENIES** Defendant Owens's motion for summary judgment; **DENIES** Defendant Borgata's motion for summary judgment; **DENIES** Defendant Heinz's motion for summary judgment; and **DENIES** Plaintiff Tedone's motion for summary judgment.

## I. Background

This case arises out of personal injuries sustained by Plaintiff Eleanor Tedone when she attempted to open a glass bottle of ketchup. Although the parties dispute the cause, the bottle broke in its neck area and shards of glass drove into her hand, injuring her. Defendant Owens-Brockway manufactured the glass bottle, Defendant H.J. Heinz filled the bottle with ketchup, and Defendant Borgata Hotel Casino & Spa served the bottle to the Plaintiff with her room-service meal.

### A. The Incident at the Borgata

Plaintiff Tedone says that the Defendants each produced, marketed, or damaged a ketchup bottle that broke in her hands. She also says that, with knowledge that she had been injured by the broken bottle, Defendants Borgata and Owens destroyed crucial evidence—initially major pieces of the broken bottle and ultimately the entire bottle itself.

In February 2005, Plaintiff Tedone and her friend Margarete Foley went to Atlantic City, New Jersey, for a weekend at the Borgata Hotel Casino & Spa. [Tedone Deposition at 23-24.] On February 20, 2005, a Sunday afternoon, Tedone and Foley ordered room service. [Tedone Dep. at 19-20.] During the meal, Plaintiff Tedone wanted ketchup with her scrambled eggs and picked up the 2.25 oz. glass bottle of Heinz ketchup that the Borgata had provided with the meal. [Tedone

Case No. 07-cv-4111
Gwin, J.

Dep. at 22.]  After removing the protective plastic seal from the bottle, Tedone attempted to twist

off the cap.  [Tedone Dep. at 22-24.]  Before she could open it, however, the bottle broke apart,

cutting her hands.  [*Id.*]

Specifically, Plaintiff Tedone held the bottle in her left hand and attempted to screw off the

cap with her right.  [Tedone Dep. at 23-24]  She did not use any utensils in an attempt to pry the cap

off nor did she strike the bottle against the table to loosen it.  [Tedone Dep. at 24, 116.]  Instead, she

twisted the cap and the bottle in opposite directions and the bottle broke within seconds.  [*Id.*]

After the bottle broke, Tedone got up and went to the bathroom to wash her hands, tossing

a fragment of the bottle toward a nearby chair.  [Tedone Dep. at 27.]  Other pieces of the bottle fell

to the floor.  [ *Id.*]  At the sink, Plaintiff Tedone tended to cuts to fingers on both her right and left

hands. [Tedone Dep. at 27-28.]

After several minutes, Borgata security officer Carl Crossman arrived in the room and

listened to the women's story.  [Tedone Dep. at 31-32.]  Crossman then took Tedone and Foley to

the hotel nurse.  [*Id.* at 32.]  There, the nurse cleaned Tedone's cuts, placing  a butterfly bandage on

the small finger of her left hand and a band-aid on the right hand.  [*Id.* at 34.]  The nurse also

informed Tedone that she would need stitches to the small finger of her left hand. [*Id.* at 35.] While

Tedone received treatment, Foley filled out a Customer Injury Report that Tedone later corrected

and signed.  [Tedone Dep. at 36.]

Plaintiff Tedone and Foley then returned to their room with a disposable camera.  [Tedone

Dep. at 44.]  Finding the room just as they had left it, Foley began taking pictures of the floor, bottle

fragments, Tedone's hands, and the sink.  [*Id.* at 46.]  Once they had finished, Tedone and Foley

took a taxi to the nearby Atlantic City Medical Center. At the Medical Center, Plaintiff Tedone

received four stitches to the small finger of her left hand and three stitches on her right middle

-3-

Case No. 07-cv-4111
Gwin, J.

finger.  [Tedone Dep. at 61.]

While Tedone and Foley were at the hospital, the staff of the Borgata cleaned her room and removed all the fragments of the broken bottle.  After returning to the hotel, Tedone and Foley remained at the hotel overnight and left for home the next day as scheduled.  [Tedone Dep. at 61-62.]    While driving home, the fingers on Tedone's left hand began tingling, with the sensation migrating through her hand and up to her elbow.  [Tedone Dep. at 66-67.]  As a result, Plaintiff Tedone saw a hand surgeon and underwent physical therapy for nerve damage in her left hand. [Tedone Dep. at 67-69.] Despite this therapy, Tedone says that her hand still tingles, gets numb, and ultimately causes her pain and difficulty working.  [Tedone Dep. at 84-85.]

### B. The Amazing Disappearing Ketchup Bottle

When the three-inch-tall Heinz ketchup bottle fell apart in Plaintiff Tedone's hands, it apparently "broke in half."  [Tedone Dep. 26.]  The cap remained attached to a small portion of the bottle's neck while the remaining portion broke into several larger fragments.  [Tedone Dep. at 28.] Besides dropping the piece that broke off in her hand, Tedone says she did not touch any of the bottle fragments.  [Tedone Dep. at 117.]

Tedone and Foley did, however, take several photographs of their room before Borgata staff cleaned it.  One shows the top portion of the bottle with the cap intact.  [Tedone Dep. at 48.] A second shows the plastic "safety seal" on the floor near the dining table.[3/]  [Tedone Dep. at 50-51, 105-106.] The final picture shows various pieces of the bottle inside a drinking glass on a table. [Tedone Dep. at 47-48, 53.]

While Tedone received medical treatment at the Atlantic City Medical Center, Borgata

---

[3/]It is unclear from the picture whether any glass fragments remain attached to this seal, although the parties at various points say that the pictures shows a portion of the bottle's side wall.

Case No. 07-cv-4111
Gwin, J.

security officer Crossman returned to Tedone's room and retrieved all the pieces of the ketchup

bottle he could find. [Doc. 38 at 8-9.] Apparently aware that a claim might be made, Crossman says

he placed the pieces in a cup and brought them to the hotel's security office for storage. [*Id.* at 9.]

Additionally, Crossman says he did not discard any pieces of the bottle. [*Id.*]

Two years later, February 17, 2007, Plaintiff Tedone filed this lawsuit in the New York State

Supreme Court and the Defendants removed the case to this Court. On December 21, 2007,

representatives for the Plaintiff, Defendant Heinz, and Defendant Borgata met to examine the bottle

fragments. [Doc. 34-15 at 7.] The Plaintiff's expert Steven Lerman also attended the meeting to

examine and photograph the bottle. [Doc. 34-15 at 7-8.] Although none of the parties offer an

explanation, the Borgata only had three pieces of the original ketchup bottle: the top portion with

the cap intact and two pieces forming the bottom. [Doc. 34-22 at 4.] The Borgata apparently lost

or discarded other pieces of the broken bottle that security officer Crossman had taken to the hotel's

security office. Nevertheless, Lerman inspected what remained of the bottle and ultimately

concluded that it had fractured because of stress induced by improper manufacturing. [Doc. 34-14

at 4.]

After this meeting, counsel for Defendant Borgata shipped the pieces to counsel for

Defendant Owens. [Doc. 34-8 at 3.] Before Owens's counsel could send these fragments to

Owens's expert William Kilpatrick, however, a member of the office cleaning crew threw them

away. [Doc. 34-8 at 4.] Thus, Kilpatrick never had the opportunity to physically examine any

portion of the original bottle. [Doc. 34-18 at 6.]

All that remains of the offending ketchup bottle in this case are the photographs taken the

day of the incident by the Plaintiff's friend Margarete Foley, the photographs taken at the December

2007 meeting of the parties, and the descriptions of the bottle included in Lerman's report and

-5-

Case No. 07-cv-4111
Gwin, J.

deposition.

### C. From Main Street Brockway to "American's Favorite Playground": A Bottle's Journey

Defendant Owens-Illinois d/b/a Owens-Brockway Glass Containers designed the 2.25 oz. glass bottle specifically for Defendant H.J. Heinz, beginning production in 1990 and continuing today. [Doc. 34-19 at 21.] Owens makes the bottles from a proprietary mold and sells only to Heinz. [*Id.*] Owens manufactured the bottle in this case at its Crenshaw, Pennsylvania, facility. [Doc. 34-19 at 32.]

Relevant to this motion, after an automated machine forms the glass ketchup bottles and places them on the production line, the bottles enter a large long tunnel called an annealing lehr. Using a computer-controlled system, the annealing lehr reheats several thousand bottles at a time to above 1050 degrees Fahrenheit. [Doc. 34-19 at 43.] Annealing allows the glass to relax and eliminates any thermally-induced stresses that the formation process may have caused. [Doc. 34-19 at 43.] For annealing to work properly, the bottles must reach this high relaxation temperature and then cool at a fairly constant rate. [Doc. 34-19 at 45-46.] The large lehr accomplishes these tasks by moving the bottles through various temperature-controlled sections, ultimately producing room-temperature bottles. [Doc. 34-19 at 45.] Afterwards, Owens inspects every bottle produced. [Doc. 34-19 at 36-37.]

After production and packing, Owens ships the pallets of bottles to an H.J. Heinz filling facility located in Fremont, Ohio. [Doc. 34-20 at 16.] Here the bottles are cleaned and then move to a filler where the machine's pockets grip the side walls of each bottle while a small tube fills it with cold ketchup. [Doc. 34-20 at 18-19, 59-61, 113-115.]

The bottles next move to an automatic capping machine. [Doc. 34-20 at 19.] This machine sets a cap on the top of each bottle then sends the bottle into two waiting belts. [Doc. 34-20 at 62-

Case No. 07-cv-4111
Gwin, J.

63.]  The top belt holds the cap flat on the bottle while the side belt grips the side wall of the bottle.

[Doc. 34-20 at 63.]  Together, these belts spin the bottle and torque the cap onto the threads of the

bottle opening.  [Doc. 34-20 at 62.]  Finally, the machine places a date code on the cap of the sealed

bottle.[4/]  [Doc. 34-20 at 19.]

　　　　After capping and coding, the conveyor moves the bottles through the sealing process.  [Doc.

34-20 at 20.]   Then, the conveyor moves the bottles to an accumulation laner, where an employee

uses a vacuum head to lift sixty bottles at a time and pack them into cases for shipment to

distributors.  [Doc. 34-20 at 20-23.] Because the filling process can sometime cause breakage, Heinz

conducts various inspections of the bottles. On January 25, 2005, Heinz recorded no bottles as

cracked, chipped, broken or otherwise defective.  [Doc. 34-20 at 163-189.]

　　　　Once inspected, Heinz ships the 2.25 oz. bottles to various distributors and retailers.  In this

case Defendant Borgata, purchased the bottle from US Foodservice in Bridgeport, New Jersey.

[Doc. 44-6 at 6.]   US Foodservice employees generally unload the shipment while Borgata

employees transport it to an in-house warehouse.  [*Id.*]

　　　　When Borgata's in-room dining department needs more bottles, a warehouse employee

delivers them in small cardboard cases.  [Doc. 44-7 at 26.]  The department then stores some bottles

on the shelves and places others on food trays in groups of 120.  [Doc. 44-7 at 26.]  When a food

order requiring ketchup comes into the department, an employee removes the necessary bottles from

the tray and places them on the room service dining cart.  [Doc. 44-7 at 6, 23.]  After the meal, the

Borgata disposes of any opened bottles but recycles those that still have an intact plastic safety seal.

[Doc. 44-7 at 5.]

---

[4/]From the parties' photographs, Heinz employee Michael Fletcher determined that Heinz filled and capped
the bottle at issue between 3-4 p.m. on January 25, 2005. [Doc. 34-20 at 77.]

Case No. 07-cv-4111
Gwin, J.

In summary, Defendant Owens manufactured the offending bottle at its Crenshaw, Pennsylvania facility.  On January 25, 2005, Defendant Heinz filled and capped the bottle in Fremont, Ohio.  Sometime between January 25, 2005, and February 20, 2005, Defendant Borgata purchased the bottle from US Foodservices in Bridgeport, New Jersey.  When the Borgata served the ketchup bottle to the Plaintiff with her room service meal, the bottle broke in her hands, cutting her.  After the injury, Plaintiff Tedone filed a five-count complaint, alleging negligence and strict liability as to all three Defendants.

## II.  Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A defendant moving for summary judgment has the initial burden of showing the absence of a genuine factual issue with respect to one or more essential elements of the plaintiff's claim.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  The moving defendant meets his burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [he] believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (quoting Fed. R. Civ. P. 56(c)). However, the moving defendant is under no "express or implied" duty to "support [his] motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving defendant satisfies his burden, the burden shifts to the nonmoving plaintiff to set forth specific facts showing a triable issue.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  The nonmoving plaintiff may not defeat the summary judgment motion merely by showing some existence of doubt as to the material facts.  *See id.* at 586.  Nor can

-8-

Case No. 07-cv-4111
Gwin, J.

the nonmoving plaintiff rely upon the mere allegations or denials of her pleadings.  Fed. R. Civ. P.

56(e).

In deciding a motion for summary judgment, the Court views the factual evidence and draws

all reasonable inferences in favor of the nonmoving plaintiff.  *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 158-59 (1970).  To be sure, the Court need not conclusively resolve an allegedly disputed issue

in favor of the nonmoving plaintiff; rather, the plaintiff must present "sufficient evidence supporting

the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of

the truth at trial."  *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968).

Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### III.  Analysis

In the various summary judgment motions filed in this action, the parties ultimately raise

three issues.  First, Defendant Owens seeks to exclude the testimony of Plaintiff Tedone's expert

Steven Lerman.  Responding, the Plaintiff says that this Court must exclude the testimony of

Defendant Owens's expert William Kilpatrick.

Second, Plaintiff Tedone asks this Court to grant her summary judgment against all or some

of the Defendants for the alleged spoliation of evidence by Defendants Borgata and Owens.  All

three Defendants oppose this request.

Finally, the Defendants separately move this court for summary judgment on the claims

against them.  In response, the Plaintiff moves for summary judgment on the grounds of strict

products liability and res ipsa loquitur.  The Court addresses each of these issues in turn.

### A. Exclusion of Expert Testimony

Case No. 07-cv-4111
Gwin, J.

Defendant Owens moves to exclude the testimony of Plaintiff's expert Steven Lerman as to the source of the bottle's fracturing, saying that Lerman is unqualified and bases his opinion on insufficient facts, fails to use reliable methods, and does not apply standard engineering principals to the case facts.  [Doc. 27 at 9-15.]  Responding, Plaintiff Tedone contends that she has "amply demonstrated" that Lerman qualifies to give expert testimony on the glass breakage in this case. [Doc. 34-9 at 21.]  Additionally, the Plaintiff says that Defendant Owens's own expert William Kilpatrick should be excluded because his opinion is fundamentally unreliable and biased.[5/] [Doc. 34-9 at 29.]

Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  Specifically, Rule 702 provides that if an expert is otherwise qualified, she may provide opinion testimony so long as: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Defendant Owens challenges Lerman's testimony based on his qualifications as well as on each of these three grounds.

First, Defendant Owens says Lerman "lacks the requisite amount of training, education and employment experience in the field of glass manufacturing" to qualify as an expert in this case. [Doc. 32 at 25.]  Courts within the Second Circuit have "liberally construed expert qualification requirements" when determining whether a witness can give expert testimony. *Robinson v. Sanctuary Record Groups*, 542 F. Supp. 2d 284, 289 (S.D.N.Y. 2008); *see also McCullock v. H.B.*

---

[5/]The Plaintiff also asks for an interested witness charge to be given should the case proceed to trial and should Kilpatrick be permitted to testify.  [Doc. 34-9 at 29.]  The Court defers any decision on that request to trial.

Case No. 07-cv-4111
Gwin, J.

*Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous."); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); *Canino v. HRP, Inc*., 105 F. Supp. 2d 21, 27 (N.D.N.Y.2000) (stating that "liberality and flexibility in evaluating qualifications should be the rule").

In determining whether a witness is qualified to render an expert opinion, the court must "first ascertain whether the proffered expert has the educational background or training in a relevant field." *TC Sys., Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002).  Then, the court "should further compare the expert's area of expertise with the particular opinion the expert seeks to offer and permit the expert to testify only if the expert's particular expertise enables the expert to give an opinion that is capable of assisting the trier of fact."  *Robinson*, 542 F. Supp. 2d at 290 (quotations and alterations omitted).  In addition, "lack of extensive practical experience directly on point does not necessarily preclude [an] expert from testifying." *TC Sys., Inc.*, 213 F. Supp. 2d at 174.  Instead, it goes to the weight of the testimony.  *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 557 (S.D.N.Y. 2005).

Based on Lerman's affidavit, deposition, and his Curriculum Vitae, this Court finds that Lerman can give expert testimony on the glass breakage associated with this case.  As to his educational background and training, Lerman has both Bachelor's and Master's degrees in chemistry, including significant study and practical work with glass fabrication, its chemical composition and structure, and its physical properties.  [Doc. 34-13 at 3, Doc. 34-15 at 16.] Moreover, Lerman has spent more than thirty-five years in the field of fracture and materials failure analysis. [Doc. 34-13 at 3, 5.]  In this capacity, Lerman worked as a laboratory analyst and manager,

-11-

Case No. 07-cv-4111
Gwin, J.

requiring knowledge and expertise in the manufacturing of glass pieces needed for lab work. [Doc. 34-13 at 4, Doc. 34-15 at 18-19.] Lerman also spent fourteen years analyzing "failed materials" for Con Edison, including determining the cause of failure of ceramic materials and "on rare occasions" glass. [Doc. 34-15 at 20.]

This education and experience sufficiently qualifies Lerman to give an opinion as to the failure of the bottle manufacturing process in this case. Specifically, Plaintiff Tedone seeks to offer Lerman's opinion that a particular failure in the manufacturing practice allowed stresses to remain in the bottle, ultimately causing its fracture. Lerman bases this opinion on his analysis of the bottle remnants. Because this type of analysis comports largely with Lerman's education and training, Lerman's testimony would assist the trier of fact in determining what caused the fracture in this case. Accordingly, this Court finds Lerman is qualified to give expert testimony on the analysis of glass failure.

Defendant Owens also claims that Lerman does not base his opinion on sufficient facts, fails to use reliable methods, and does not apply principals to the case facts. [Doc. 27 at 10-15.] To support this contention, Defendant Owens says that Lerman undertook only a "single examination of incomplete sections of the bottle," failed to "gain meaningful understanding of the [Owens] manufacturing or Heinz filling processes," reached his conclusions based on "totally erroneous" assumptions that directly contradict generally recognized principles, failed to provide "detailed information or documentation as to the location of the initial fracture origin," and did not identify "a particular problem with the annealing process that supports his theory." [*Id.*]

The Court finds that these attacks on Lerman's testimony go to its weight, not admissibility. As to sufficient facts, Lerman examined all the pieces of the bottle that the Defendants retained. Moreover, Lerman stated that though he would have preferred to examine the entire bottle, the

-12-

Case No. 07-cv-4111
Gwin, J.

fragments he did inspect had "unique aspects" that "pretty much told the whole story" of the breakage. [Doc. 34-15 at 33.]

In fact, Lerman testified that when assessing the fragments, he took dimensional measurements, examined for nicks and bubbles, analyzed the ridges along the break lines, and fitted the pieces together. [Doc. 34-15 at 31.] This analysis comports with the Standards and Guidelines for analyzing glass fractures produced by the Scientific Working Group for Materials Analysis (SWGMAT). [Doc. 34-17.] Ultimately, Lerman concluded that the bottle fractured because of improper annealing, which according to the SWGMAT guidelines, would create a curved, smooth edge along the break and "no indication of the point of origin of the crack." [Doc. 34-17 at 4.]

As to Lerman's analytical process and applications, the Defendant urges this Court that Lerman's methods and conclusions are wholly inconsistent with generally recognized principals. [Doc. 27 at 11.] Defendant Owens fails, however, to cite any authority—legal or scientific—to support this contention. Instead, the Defendant simply repeats that Lerman's statements are "not true" and offers competing scientific conclusions. [Doc. 27 at 12-13.] Even if supported by the testimony of its own expert, however, Defendant Owens's evidence would not compel exclusion of Lerman's opinion. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002) (noting that *Daubert* inquiry focuses on "the principles and methodology employed by the expert," and that "Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony").

Ultimately, the Defendant's challenge to Lerman's qualifications and methods go to the weight of his testimony, not its admissibility. *See McCullock*, 61 F.3d at 1043 ("[Defendant]'s quibble with Woolley's academic training . . . and his other alleged shortcomings (lack of knowledge

-13-

Case No. 07-cv-4111
Gwin, J.

regarding the chemical constituents of the fumes or the glue vapor's concentration level), were

properly explored on cross-examination and went to his testimony's weight and credibility—not its

admissibility."). Accordingly, this Court **DENIES** Defendant Owens's motion to exclude Lerman's

testimony.

In defending her expert, the Plaintiff also moves this Court to exclude Defendant Owens's

expert William Kilpatrick.  [Doc. 34-9 at 29.]  According the Plaintiff, Kilpatrick's testimony "is

not based upon sufficient facts and is fundamentally unreliable and biased, since he was not able to

observe or test any portion of the fractured bottle."  [*Id.*] Specifically, the Plaintiff does not claim

that Kilpatrick is unqualified generally on the issue of industrial glass manufacturing and glass

breakage.  Instead, she says that Kilpatrick's proffered "impact theory"—that the ketchup bottle

fractured as a result of an impact after it left the Heinz filling plant—lacks any factual support.[6]

[Doc. 34-9 at 31.]

Here again, however, the challenge to the expert's testimony is more properly directed to its

weight not its admissibility.  Kilpatrick testified that although he could not examine the specific

pieces of glass, he did examine the photographs taken at the December 2007 meeting.[7]  [Doc. 34-19

at 53-65.]  Using these photographs as well as the anecdotal evidence provided by the parties,

Kilpatrick opined that only a post-manufacturing impact could have permitted the bottle to

completely fracture under the small amount of force applied by the Plaintiff. [Doc. 34-19 at 64-65.]

---

[6]In his report, Kilpatrick concluded: "[T]he 'flaw' in the bottle was created at some point after the bottle was filled and the metal closure applied. The most likely 'flaw' would be damage from a hard impact or some other mishandling at some point relatively close in time to plaintiff's accident." [Doc. 34-18 at 9.]

[7]Moreover, similar to the Lerman's testimony that he was confident in his conclusions despite being unable to examine the entire bottle, [Doc. 34-15 at 33], Kilpatrick states that he also has as "high degree of confidence" in his conclusion and that examining the actual bottle fragments would only "validate and verify what other information has already been presented." [Doc. 34-19 at 63-64.]

Case No. 07-cv-4111
Gwin, J.

This photographic analysis, coupled with Kilpatrick's knowledge of the general bottle manufacturing process, knowledge of Heinz's filling process, and incorporation of the Plaintiff's own testimony as to the circumstances of the break provides adequate factual support to allow his testimony to pass through the "gate" and come before the fact finder. *Cf. Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91-92 (2d Cir. 2000) (upholding exclusion of expert who had never seen injury-causing instrumentality, either in person in or in photographs, had never spoken to witnesses, and was unaware of basic facts).

Plaintiff Tedone says that this Court should also exclude Kilpatrick's testimony because he is an interested witness. [Doc. 34-9 at 33.] For support, the Plaintiff notes that Kilpatrick has worked at Owens for 31 years and served as product safety manager when Owens made the bottle at issue here. [Doc. 34-19 at 9-11.]

Kilpatrick's position with Owens, however, does not automatically disqualify him from rendering expert testimony in this case. *See, e.g., Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005) ("Defendants' arguments that [Plaintiff's employee] is an interested witness . . . may be raised on cross-examination at trial on the issues of [his] bias and credibility, and the appropriate weight, if any, to be afforded his expert testimony."). Moreover, his testimony would not be so "unduly prejudicial" that it should be excluded entirely. *Cf. Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 515 (2d Cir. 1989) (upholding district court's exclusion of expert witness as "interested party" where expert introduced plaintiff and defendant companies and facilitated their first agreement).

Instead, Plaintiff Tedone may raise the issue of Kilpatrick's alleged bias on cross-examination and may ask the Court for an interested witness charge at trial if the facts and law merit. Accordingly, this Court **DENIES** Plaintiff Tedone's motion to exclude Kilpatrick's testimony.

-15-

Case No. 07-cv-4111
Gwin, J.

## B. Spoliation of Evidence

Plaintiff Tedone says that she is entitled to a spoliation remedy against all three Defendants because the entire bottle was not preserved after the initial injury and because the remaining fragments of the bottle were thrown away after the Plaintiff's expert inspected them.  Defendant Borgata says that it preserved some fragments of the bottle but provides no explanation for the missing pieces.  Defendant Owens says that the Plaintiff had sufficient opportunity to examine the bottle before Owens's counsel lost the remaining fragments, and Defendant Heinz says that it cannot be held responsible for any alleged spoliation by the other Defendants.

On October 14, 2008, after learning of Owens's loss of the bottle fragments, this Court ordered that "Consideration of the issue of spoliation of evidence . . . will be postponed until trial." [Doc. 21.]  Plaintiff Tedone nevertheless asks this Court to consider spoliation sanctions at the summary judgment stage largely as a defense to Defendant Owens's motion to exclude the Plaintiff's expert.[8/]  [Doc. 34-24 at 11.]

An analysis of the spoliation issue on summary judgment would be appropriate only if this Court concludes that the loss of the bottle fragments was willful or in bad faith or has prejudiced the Plaintiff at this stage of the litigation.  *See Valentine v. Museum of Modern Art*, 29 F.3d 47, 49-50 (2d Cir. 1994) ("[D]ismissal with prejudice is a harsh remedy to be used only in extreme situations . . . and then only when a court finds willfulness, bad faith, or any fault" on the part of the non-moving party); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (remedy for spoliation should be designed to "restore the prejudiced party to the same position he would have

---

[8/]Specifically, Plaintiff Tedone says, "Defendant Owens claims that no new circumstances justify the Court's reconsideration of its prior ruling deferring the spoliation issue until trial, ignoring the fact that Owens inspired the review by seeking to disqualify Plaintiff's expert on the ground that he did not inspect all pieces of the subject bottle." [Doc. 34-24 at 11.]

Case No. 07-cv-4111
Gwin, J.

been in absent the wrongful destruction of evidence by the opposing party").

At this point in this case, the Court finds it premature to decide what sanctions, if any, should flow from Defendant Borgata's alleged discarding of the glass fragments and Defendant Owens's loss of the remaining fragments. Moreover, given this Court's denial of the motion to exclude Lerman's testimony and this Court's analysis of the parties' substantive motions for summary judgment, the Court finds that the Plaintiff has not been prejudiced *at this stage of the litigation* by the loss of the bottle.

Accordingly, the Court declines to reconsider its previous order and defers consideration of any sanctions for spoliation to trial.

### C. Summary Judgment

In their various motions for summary judgment, the parties essentially present two substantive questions to the Court: (1) whether the Plaintiff may proceed against any or all three of the Defendants on a theory of strict products liability, and (2) whether the Plaintiff may proceed against Heinz or Borgata on a theory of negligence.[9]

In ruling on the motions, the Court first examines whether the parties have met their respective burdens on proving a defect or lack thereof for purposes of strict liability. If the Plaintiff has produced sufficient evidence, the Court then considers which Defendants can be held strictly liable. Finally, the Court examines whether the Plaintiff has provided sufficient evidence of negligence to preclude summary judgment.

### *1. Strict Liability*

As to strict liability, the Defendants say that the Plaintiff has failed to meet her burden of

---

[9]Although Defendant Owens mentions the standard of reasonable care in its memorandum, it does not make any affirmative argument on the issue of negligence. [Doc. 27 at 16.]

Case No. 07-cv-4111
Gwin, J.

demonstrating a triable issue of fact as to the existence of a manufacturing defect in the bottle. In addition, Defendant Borgata argues that strict liability does not apply to it because it is not a "seller" of ketchup bottles. Responding, the Plaintiff says that she has in fact produced direct evidence of a manufacturing defect and that Defendant Borgata "sells" ketchup bottles for purposes of strict liability.

A defendant seeking dismissal of a strict products liability claim on summary judgment must "submit proof in admissible form establishing that plaintiff's injuries were not caused by a manufacturing defect in the product." *Brown v. Borruso*, 660 N.Y.S.2d 780, 781 (N.Y. App. Div. 1997); *see also Rachlin v. Volvo Cars of N. Am., Inc.*, 734 N.Y.S.2d 798, 799 (N.Y. App. Div. 2001). Defendants can meet this burden by submitting evidence of tests, mechanical processes, and inspections, among others. *See, e.g.*, *Vogel v. Am. Motorized Prods., Inc.*, 824 N.Y.S.2d 129, 130 (N.Y. App. Div. 2006) (evidence that product underwent mechanical testing and was free from defects prior to entering stream of commerce); *Rachlin*, 734 N.Y.S.2d at 799 (evidence that allegedly defective car brakes did not fail during a 4- to 5-hour test-drive session during week prior to plaintiffs' accident); *Brown*, 660 N.Y.S.2d at 781 (results of destructive testing of allegedly defective seat belt showed no defect); *McDonald v. Grasso*, 632 N.Y.S.2d 240, 241 (N.Y. App. Div. 1995) (testimony that product functioned normally during testing and mechanically could not fail in the manner plaintiff alleged).

Once the defendant has established as a matter of law that the product was not defective, the burden shifts to the plaintiff to demonstrate a triable issue of fact as to whether a defect nevertheless existed. *McArdle v. Navistar Int'l Corp.*, 742 N.Y.S.2d 146, 148 (N.Y. App. Div. 2002); *Rachlin*, 734 N.Y.S.2d at 798. In order to do so, the plaintiff "cannot rely solely upon the occurrence of the accident, but must submit some direct evidence that a defect existed." *McArdle*, 742 N.Y.S.2d 146,

-18-

Case No. 07-cv-4111
Gwin, J.

148; *see also Rachlin*, 734 N.Y.S.2d at 799; *Brown*, 660 N.Y.S.2d at 781.

In support of its argument that the Plaintiff here has failed to show a defect, Defendant Owens cites *Preston v. Peter Luger Enters., Inc.*, 858 N.Y.S.2d 828 (N.Y. App. Div. 2008).  In *Preston*, the court affirmed summary judgment for the defendant bottle manufacturer on a strict products liability claim.[10] *Id.* at 831.  First, the court held that the manufacturer's detailed evidence of its bottle inspection process satisfied its burden to show that the bottle was not defective. *Id.*  The court then found that the plaintiff had not met her burden to show a triable issue because her expert:

> [F]ailed to explain the significance of [his] findings and did not cite to any industry standards or data to support a conclusion that such discontinuities in the glass bottle were irregular or otherwise affected the structural integrity of the bottle.  More importantly, [the expert] equivocally concluded that there were *potentially* manufacturing defects in this bottle that caused it to fail, thus rendering his opinion as to a specific defect wholly speculative.

*Id.* at 832.

The Court finds the instant case distinguishable from *Preston*.  Here, even assuming that Defendant Owens offers evidence that the ketchup bottle was not defective when it left its manufacturing facility, Plaintiff Tedone has demonstrated that a triable issue exists as to a defect in the bottle.  Specifically, by her expert's report and testimony, Plaintiff has produced direct evidence that the bottle failed as a result of improper annealing during the manufacturing process.  Unlike the *Preston* expert, Lerman has identified specific properties of the bottle fragments that he contends support a specific theory of failure: improper annealing.

Although Defendant Owens disputes this theory, arguing that such an isolated failure simply could not occur, this dispute is one of material fact that must be resolved at trial.  Accordingly, the

---

[10] The plaintiff's wife had purchased a bottle of steak sauce from the grocery store.  When he attempted to open it, the neck of the bottle broke and injured him.  He then brought claims against the bottle manufacturer for strict products liability and negligence. 858 N.Y.S.2d at 830.

Case No. 07-cv-4111
Gwin, J.

Court **DENIES** Defendant Owens's motion for summary judgment.

As to Defendant Heinz, "Distributors and retailers may be held strictly liable to injured parties, even though they may be innocent conduits in the sale of the product . . .." *Godoy v. Abamaster of Miami, Inc.*, 754 N.Y.S.2d 301, 305 (N.Y. App. Div. 2003).  In fact, "It is well settled that strict products liability extends to retailers and distributors in the chain of distribution even if they never inspected, controlled, installed or serviced the product. *Perillo v. Pleasant View Assoc.*, 739 N.Y.S.2d 504, 505 (N.Y. App. Div. 2002); *see also Michael v. Gen. Tire, Inc.*, 747 N.Y.S.2d 40, 41 (N.Y. App. Div. 2002).

Defendant Heinz does not dispute this proposition of law.  Instead, it argues that the Plaintiff fails to meet her burden on the issue of a manufacturing defect. [Doc. 47 at 4-10.]  Because the Court holds that Plaintiff Tedone has shown a triable issue of fact as to the existence of a defect, the Court **DENIES** Defendant Heinz's motion for summary judgment.

Finally, as to Defendant Borgata's potential strict liability, Borgata says that the Plaintiff fails to show a manufacturing defect—an argument this Court has already rejected—and that strict liability cannot be extended to it because it is a non-seller or mere "casual seller" of ketchup bottles. [Doc. 29 at 3-5.]  This Court finds, however, that Borgata can be subject to strict liability.

"One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." Restatement (Third) of Torts: Products Liability § 1 (1998 & Supp. 2009); *see also Sukljian v. Ross & Sons Corp.*, 503 N.E.2d 1358, 1360 (N.Y. 1986).  Moreover, "Whether a defendant is a commercial seller or distributor within the meaning of this Section is usually a question of law to be determined by the court." Restatement (Third) of Torts: Products Liability § 1 cmt. c (1998 &

-20-

Case No. 07-cv-4111
Gwin, J.

Supp. 2009).

In this case, Defendant Borgata makes two arguments to support its improbable claim that it is not a seller or distributor of the arguably defective product.  First, Borgata says that it did not in fact "sell" the ketchup bottle to Plaintiff Tedone but provided it as a free part of a room service meal. [Doc. 29 at 4 ¶12.] Second, the Borgata says that any "sale" of ketchup is incidental to its true business of running a casino and operating a hotel. [Doc. 29 at 5 ¶15.]

As to the first argument, the Defendant cites no authority requiring that a technical, isolated "sale" occur before a party may be subject to strict products liability for distributing a defective product.  In fact, existing case law counsels against such a restrictive understanding of the doctrine. *See, e.g.*, *Jaramillo v. Weyerhaeuser Co.*, 906 N.E.2d 387, 391-94 (N.Y. 2009) (imposition of strict liability is governed by public policy considerations, not technical analysis of defendant's actions); *see also Gunning v. Small Feast Caterers, Inc.*, 777 N.Y.S.2d 268, 271-72 (N.Y. Sup. Ct. 2004) (holding that exploding glass of water was "indispensable part of the meal that was sold to the patron," and presuming that "the cost of providing the drink was built into the bill"); *Levondosky v. Marina Assoc.*, 731 F. Supp. 1210, 1212-13 (D.C.N.J. 1990) (holding that defendant casino could not avoid strict liability by arguing that it did not "sell" plaintiff his complimentary drink).  Having sold Plaintiff a meal—a meal that included ketchup—Defendant Borgata cannot plausibly claim that the sale of the ketchup was not part of its regular business practices.  As noted below, Borgata admits it purchases and stocks caseloads of ketchup.

In support of its second argument, Defendant Borgata relies primarily upon *Gobhai v. KLM Royal Dutch Airlines*, *supra*.  In *Gobhai*, the plaintiff alleged strict products liability against the defendant airline company after she slipped and fell in her son's apartment while wearing a pair of slippers the airline had given her son on a transatlantic flight. 445 N.Y.S.2d at 446.  The court

-21-

Case No. 07-cv-4111
Gwin, J.

dismissed the claim, finding that KLM "is not in the business of manufacturing or selling slippers but is in the business of providing air transportation for passengers and cargo." *Id.* at 447. The court reasoned further, "Distribution of these goods by KLM was incidental to the basic service provided and the slippers were for in-flight use by defendant's first class passengers." *Id.*

In this case, however, Defendant Borgata's provision of the ketchup bottle was not merely incidental to its business as a hotel and casino. According to Borgata's own manager of in-room dining, his staff serves approximately 30,000 guests per month. [Doc. 44-7 at 4.] Thus, unlike the occasional pair of slippers provided to first class passengers in *Gobhai*, here the Defendant regularly provides condiments with its room service meals, potentially serving as many as 300 bottles of ketchup per day. [Doc. 44-7 at 12.] In fact, the in-room dining staff keeps two separate trays of 120 bottles each on standby for delivery to guest rooms with appropriate meals. [Doc. 44-7 at 26.]

Moreover, *Gunning v. Small Feast Caterers, Inc.*, *supra*, supports this Court's conclusion. In *Gunning*, the court held that a patron could sue the defendant restaurant when he was injured by shards from a broken water glass. The court reasoned, "[T]his product is not merely an amenity, like slippers given to an airline passenger, but is an important component of the meal. As such, strict liability may be imposed upon the defendant." 777 N.Y.S.2d at 271. Similarly here, the ketchup bottle automatically provided to the Plaintiff with her lunch was an integral part of her room service meal.

In addition, the public policies underlying strict liability support extending it to Defendant Borgata. As the court in *Sukljian* summarized:

> [S]ellers, by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation; additionally, by marketing the products as a regular part of their business such sellers may be said to have assumed a special responsibility

-22-

Case No. 07-cv-4111
Gwin, J.

to the public, which has come to expect them to stand behind their goods.

503 N.E.2d at 1360.  In this case, Defendant Borgata cannot claim that it lacks the opportunity or

incentive to ensure that the approximately 5,000 ketchup bottles it serves each month are safe.

Accordingly, this Court **DENIES** Defendant Borgata's motion for summary judgment as to

strict liability.

For the same reasons articulated *supra*, the Court finds summary judgment in Plaintiff

Tedone's favor similarly unwarranted.  Although the Plaintiff's expert opines that the bottle failed

due to improper annealing, the Defendant's expert disagrees and concludes that based on the

manufacturing process, quality controls, and anecdotal evidence, the bottle failed because of some

later impact.  These conflicting conclusions present a dispute of a fact essential to determining the

potential strict liability of all three Defendants.  Accordingly, the Court **DENIES** Plaintiff Tedone's

motion for summary judgment on her strict liability claim.

*2. Negligence*

In its motion for summary judgment, Defendant Heinz says this Court must dismiss Plaintiff

Tedone's negligence claim against it as a matter of law because, "[P]laintiff has simply failed to

provide any evidence that Heinz breached any duty it might have owed her."  [Doc. 45 at 9.]

Defendant Borgata similarly says that there is no evidence that it created or had notice of any defect

in the bottle prior to serving it to the Plaintiff.  [Doc. 28-2 at 3-4.] In response, Plaintiff Tedone says

that the theory of res ipsa loquitur defeats summary judgment for Heinz and Borgata and in fact

entitles to her to summary judgment against all three Defendants.  [Doc. 34-9 at 48, 39.]

As an initial matter, "[T]he doctrine of res ipsa loquitur does not entitle a plaintiff to

summary judgment." *Tane v. Whipple-Allen Const. Co., Inc.*, 667 N.Y.S.2d 587, 588 (N.Y. App.

Div. 1997).  "Res ipsa loquitur is a rule of evidence, which merely provides a permissible inference

Case No. 07-cv-4111
Gwin, J.

of negligence, rather than a presumption. Thus, application of the doctrine as a basis for awarding summary judgment is inappropriate." *Vaynberg v. Provident Operating Corp.*, 703 N.Y.S.2d 208, 209 (N.Y. App. Div. 2000) (internal citations omitted). Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment on the theory of res ipsa loquitur.[11/]

Generally, to make out a negligence claim, a plaintiff must show: "1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage." *Febesh v. Elcejay Inn. Corp.*, 555 N.Y.S.2d 46, 47 (N.Y. App. Div. 1990). As to the duty owed, "Manufacturers and suppliers are not obliged to supply merchandise that is accident proof but are held to the same standard applied in negligence cases generally, reasonable care." *Biss v. Tenneco, Inc.*, 409 N.Y.S.2d 874, 876 (N.Y. App. Div. 1978). Applying New York law, however, courts in the Second Circuit have cautioned against granting summary judgment to defendants on the issue of breach of this duty. *See Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 118-19 (2d Cir. 2006); *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 466 (S.D.N.Y. 2007) ("Summary judgement is inappropriate where there exists in the record *any* evidence that could reasonably support a finding in favor of the non-movant.").

Although the question is close in this case, the Court finds that Plaintiff Tedone has provided sufficient evidence to support an inference of Heinz's and Borgata's negligence. Specifically, Defendant Owens's expert Kilpatrick concluded that the ketchup bottle broke because of a preexisting flaw—most likely damage from a hard impact or some other mishandling. [Doc. 34-18

---

[11/]Although some New York courts have recognized that summary judgment based on the theory of res ipsa loquitur might be appropriate where "the prima facie proof is so convincing that the inference of negligence arising therefrom is inescapable and unrebutted," *Smith v. Tabb*, 801 N.Y.S.2d 652, 653 (N.Y. App. Div. 2005), this is simply not the case here.

Case No. 07-cv-4111
Gwin, J.

at 9.]  As to the source of the impact, Kilpatrick opined: "The incident bottle could have been damaged by the improper handling of the full case of bottles in which it was packed and shipped," and, "This type of full case handling damage could have occurred in the warehouse where filled goods were stored prior to being shipped." [Doc. 34-18 at 8.]

In addition, Kilpatrick agreed that the Heinz safety seal and product label "could have prevented [the bottle] from failing immediately at the time the damage occurred . . . and could have held the bottle together." [ Doc. 34-19 at 82-83.]  In fact, Borgata's in-room dining manager testified that his staff recycles bottles that are delivered to guests but unused. [Doc. 44-7 at 5.]

Again, although the Court recognizes the issue is close, it nevertheless concludes that a jury could infer that Heinz and Borgata negligently handled the bottle, reused it, or failed to properly inspect it before it reached the Plaintiff.[12]

Accordingly, this Court **DENIES** Defendants Heinz's and Borgata's motions for summary judgment.

## IV.  Conclusion

For the foregoing reasons, the Court: **DENIES** the Defendant's motion to exclude the Plaintiff's expert Lerman and **DENIES** the Plaintiff's motion to exclude the Defendant's expert Kilpatrick; **DEFERS** consideration of the issue of spoliation until trial; **DENIES** Defendant Owens's motion for summary judgment; **DENIES** Defendant Borgata's motion for summary judgment; **DENIES** Defendant Heinz's motion for summary judgment; and **DENIES** Plaintiff

---

[12]Because it finds that Plaintiff Tedone has submitted sufficient evidence of negligence, the Court does not consider the parties' arguments relative to the doctrine of res ipsa loquitur.

Case No. 07-cv-4111
Gwin, J.

Tedone's motion for summary judgment.

      IT IS SO ORDERED.


Dated: November 23, 2009

                             _____
                             JAMES S. GWIN
                             UNITED STATES DISTRICT JUDGE